NOT FOR PUBLICATION

IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. THOMAS AND ST. JOHN


|  |  |  |
|---|---|---|
| GALT CAPITAL, LLP, and BRUCE RANDOLPH TIZES, | ) ) ) | Civil No. 2002-63 |
|  | ) |  |
|        Plaintiffs, | ) |  |
|  | ) |  |
|        v. | ) |  |
|  | ) |  |
| EDWARD A. SEYKOTA, | ) |  |
|  | ) |  |
|        Defendant. | ) |  |
|  | ) |  |
| _____ | ) |  |
|  | ) |  |
| EDWARD A. SEYKOTA, | ) |  |
|  | ) |  |
|     Counterclaimant and | ) |  |
|     Third-party Plaintiff, | ) |  |
|  | ) |  |
|        v. | ) |  |
|  | ) |  |
| GALT CAPITAL, LLP, and BRUCE RANDOLPH TIZES, | ) ) |  |
|  | ) |  |
|     Counterclaim Defendants, | ) |  |
|  | ) |  |
| and SYDNEY STERN, | ) |  |
|  | ) |  |
|     Third-party Defendant. | ) |  |
| _____ | ) |  |

```
SYDNEY C. STERN,                    )
                                    )      Civil No. 2002-134
              Plaintiff,            )
                                    )
        v.                          )
                                    )
EDWARD A. SEYKOTA,                  )
                                    )
              Defendant.            )
_____)
```

Attorneys:


**A. Jeffery Weiss, Esq.**
     St. Thomas, U.S.V.I.
     *For Sydney C. Stern*,


**Kevin D'Amour, Esq.**
     St. Thomas, U.S.V.I.
     *For Edward A. Seykota*.


## MEMORANDUM OPINION

Before the Court is the motion of Edward A. Seykota ("Seykota") for summary judgment against Sydney C. Stern ("Stern") on several claims in *Galt v. Seykota*, Civil No. 2002-63 and *Stern v. Seykota*, Civil No. 2002-134.

## I. BACKGROUND

Stern and Seykota met in New Jersey in 1997.  Shortly thereafter they began a romantic relationship.  Stern moved in with Seykota to perform household tasks and care for his two children.

Civil Nos. 2002-63 & 2002-134
Memorandum Opinion
Page 3

In December, 1997, Stern and Seykota moved to Nevada, where
Seykota began his own investment business (the "investment
business" or the "business").  Stern alleges that she and Seykota
were partners in the business.  Stern further alleges that they
agreed Seykota would conduct the trading and she would manage the
rest of the work.[1]  According to Stern, the parties agreed to
split the performance profits equally, but she did not receive
any payments, because under their agreement Seykota continually
reinvested profits.

In August, 2000, Seykota left his investment business to
start Galt Capital LLP ("Galt") with Bruce Randolph Tizes
("Tizes").  According to Stern, the nature of her business
agreement with Seykota changed when Seykota started Galt.   Stern
has stated that Tizes took over managing business aspects of the
investments, while she continued to perform clerical tasks.

Stern and Seykota relocated to the Virgin Islands in early
2001. Seykota purchased condominiums in Secret Harbor (the
"condominiums" or the "property") and began construction on a
home in Estate Peterborg.

In May, 2001, Stern alleges that Seykota promised her
ownership of the condominiums, where he intended for her to

_____

[1] Stern claims that her tasks included taking care of the clients, researching
stock, paying bills for the business, billing clients, investigating hedge
fund management, meeting with brokers, and renegotiating brokers' turnaround
fees "among a myriad of other things."  See Stern Dep., Aug. 27, 2002 at 44.

Civil Nos. 2002-63 & 2002-134
Memorandum Opinion
Page 4

reside when he moved to Estate Peterborg.   In reliance on this
promise, Stern claims that she managed renovations on the
condominiums while investing $52,000 of her own money in the
improvements.

     During their time in St. Thomas, Stern alleges that Seykota
became increasingly hostile, causing her to suffer anxiety
attacks and depression.   Stern further alleges that her condition
became so severe that she required counseling and medication.

     In February, 2002, Seykota permanently left St. Thomas and
returned to Nevada.   Shortly after Seykota left, he told Stern
to vacate the condominiums.

     On April 3, 2002, Galt and Tizes filed Civil No. 2002-63,
naming Seykota as the sole defendant.   On June 10, 2002, Seykota
filed an answer, and a third-party complaint against Stern.[1]
Seykota alleged, *inter alia*, that he has a right to recover the
condominiums from Stern's possession, and to get damages for
wrongful possession.   Stern filed a counterclaim against Seykota
(the "Stern Counterclaim").   Stern also initiated a separate
action in the Virgin Islands Superior Court against Seykota (the
"Stern Complaint").   Seykota removed Stern's separate action to
this Court, where it was assigned Civil No. 2002-134.

---

     [1] Confusingly, this document is labeled as "counterclaims" and includes
its allegations against Stern, a third-party defendant, alongside its claims
against the plaintiff.

Civil Nos. 2002-63 & 2002-134
Memorandum Opinion
Page 5

In the Stern Counterclaim, Stern alleges ten counts against
Seykota.  With respect to the investment business, Stern claims
breach of contract, unjust enrichment, intentional
misrepresentation, and detrimental reliance. With respect to the
condominiums, Stern claims an equitable lien, unjust enrichment,
and breach of contract.  Stern also claims that Seykota owes her
damages for negligent infliction of emotional distress,
intentional infliction of emotional distress and slander.  Three
of the counts in Stern's Counterclaim are re-alleged in Stern's
Complaint.[2] Stern also alleges a unique claim in Count III of her
complaint: intentional misrepresentation with regard to the
condominiums.

Seykota seeks summary judgment on his third-party claim for
recovery of the condominiums.  Seykota also seeks summary
judgment on all the claims brought by Stern.

## II. DISCUSSION

Summary judgment is appropriate if "the pleadings,
depositions, answers to interrogatories, and admissions on file,
together with the affidavits, if any, show that there is no
genuine issue as to any material fact and that the moving party
is entitled to a judgment as a matter of law."  Fed. R. Civ. P.

---

[2] Specifically, Count I of Stern's Complaint is identical to Count V of
Stern's Counterclaim; Count II of Stern's Complaint is identical to Count VI
of Stern's Counterclaim; and Count IV of Stern's Complaint is identical to
Count IX of Stern's Counterclaim.

Civil Nos. 2002-63 & 2002-134
Memorandum Opinion
Page 6

56(c); *see also Hersh v. Allen Prod. Co.*, 789 F.2d 230, 232 (3d
Cir. 1986).

The movant has the initial burden of showing there are no
"genuine issues of material fact," but once this burden is met
the non-moving party must establish specific facts showing there
is a genuine issue for trial. *Gans v. Mundy*, 762 F.2d 338, 342
(3d Cir. 1985). A genuine issue of material fact exists when
"there is sufficient evidence favoring the non-moving party for a
jury to return a verdict for that party." *Anderson*, 477 U.S. at
249. In making this determination, this Court draws all
reasonable inferences in favor of the non-moving party. *See Bd.
of Educ. v. Earls*, 536 U.S. 822, 850 (2002).

### III. ANALYSIS

**A.  Seykota's Action for Recovery**

Seykota argues that he owns the condominiums, and is
entitled to eject Stern and recover for damages that he incurred
when Stern refused to vacate the property.

However, because material facts remain in dispute, Seykota
is not entitled to summary judgment on his recovery claim.

**B. Stern's Counterclaim and Complaint**

**i.  Breach of Contract**

In Count I of Stern's Counterclaim, she alleges breach of
contract. To succeed on a breach of contract claim, a plaintiff

Civil Nos. 2002-63 & 2002-134
Memorandum Opinion
Page 7

must show four elements: (1) an agreement, (2) a duty created by

that agreement, (3) a breach of that duty, and (4) damages.  *See*

*Stallworth Timber Co. v. Triad Bldg. Supply*, 968 F. Supp. 279,

282 (D.V.I. App. Div. 1997); *see also* Restatement (Second) of

Contracts §§ 235, 237, 240 (1965) (defining breach of contract).

Seykota argues that the Statute of Frauds bars Stern from

any recovery on her breach of contract claim involving the

investment business.  He relies on the mistaken belief that

Stern's claims involve an agreement for services over one year,

and therefore must be committed to writing to have any legal

effect. Seykota ignores the Restatement's clear directive that

"[c]ontracts of uncertain duration are simply excluded" from the

Statute of Frauds.  Restatement (Second) of Contracts, § 130 cmt.

a (1981).

Stern's claims rely on a contract for services that did not

state any clear duration.  Accordingly, Seykota cannot succeed on

a Statute of Frauds defense with respect to this claim.

Seykota further argues that Stern cannot succeed on her

breach of contract claim with respect to the partnership, because

the parties never entered the contract she alleges. He relies on

his own deposition denying the existence of an agreement.

However, Stern refutes this in her deposition, stating

"[t]he deal was that I would handle the business side. . . . He

Civil Nos. 2002-63 & 2002-134
Memorandum Opinion
Page 8

would do all the trading. . . . And we would split profits,
performance profits 50-50."  Stern Dep., Aug. 27, 2002, at 60.

Because there are material facts in dispute, Seykota's
motion for summary judgment on Count I of Stern's Counterclaim
will be denied.

**ii. Unjust Enrichment**

In Count II of Stern's Counterclaim, she alleges that
Seykota was unjustly enriched by her work for the investment
business.  An unjust enrichment claim requires proof of four
elements: (1) a clear and definite verbal agreement, (2) the
defendant's knowledge and intent to enter into the agreement, (3)
a benefit conferred upon the defendant as a result of the
agreement; and (4) that "equity and good conscience" require the
defendant return the benefit to the plaintiff.  *See Gov't Guar.*
*Fund. Of Fin. v. Hyatt Corp.,* 955 F. Supp. 441, 460 (D.V.I.
1997); *Pourzal v. Marriott Intern'l, Inc,* Civil No. 2001-140,
2006 WL 2471818 at *3 (D.V.I., August 18, 2006)(not for
publication).

Seykota argues that Stern cannot show any of these elements.
First, Seykota relies upon his deposition, which states that he
never agreed to pay Stern fifty percent of the performance
profits.  This is flatly disputed by Stern in her deposition.

Second, Seykota relies on his deposition as evidence that

Civil Nos. 2002-63 & 2002-134
Memorandum Opinion
Page 9

Stern did little work for the investment business.  Again, Stern
disputes this claim in her deposition and affidavit, which state
that Stern worked extensively for the investment business.

Seykota's version of events is disputed on almost every
point.  As a result, his motion for summary judgment on Count II
of Stern's Counterclaim will be denied.

### iii. Intentional Misrepresentation

In Count III of Stern's Counterclaim, she alleges that
Seykota intentionally misrepresented her compensation for work in
the investment business.

The Court must consider Stern's claims for intentional
misrepresentation in light of the alleged contract she and
Seykota entered compensating her for her work in the investment
business.  When an action in tort accompanies a breach of
contract claim, the allegations of tortious conduct must arise
from "a duty or obligation... independent of that arising out of
the contract itself."  *See Jo-Ann's Launder Ctr, Inc. v. Chase
Manhattan Bank*, N.A., 854 F. Supp. 387, 392 (D.V.I. 1994)
(granting a motion for summary judgment).  In assessing whether
such a duty exists, "[t]he gist of the action test is used to
'determine whether tort claims that accompany contract claims
should be allowed as freestanding causes of action or rejected as
illegitimate attempts to procure additional damages for a breach

Civil Nos. 2002-63 & 2002-134
Memorandum Opinion
Page 10

of contract." *Charleswell v. Chase Manhattan Bank, N.A.*, 308 F.
Supp.2d 545, 567 (D.V.I. 2004)(internal quotations omitted)
(granting a motion to dismiss for failure to state a claim).

The gist of the action test requires that the Court consider
the essential nature of the claim as distinguished between
contract and tort on a basis of the duties allegedly breached.
*See Charleswell,* 308 F. Supp.2d at 567.  "An independent tort
action is not cognizable where there is no duty owed to the
plaintiff other than the duty arising out of the contract
itself." *Int'l Minerals and Mining Corp. v. Citicorp N. Am.,*
Inc., 736 F. Supp. 587, 596 (D.N.J. 1990).

Stern's intentional misrepresentation claim arises entirely
from her allegations that Seykota breached their alleged
agreement that "all profits from the [investment] business
endeavors would be shared equally between [the parties] and that
Seykota would take charge of investing all profits...."  *See*
Stern Counterclaim, July 26, 2002, at ¶ 58; *see also id.* at ¶ 67
(claiming that as a result of the intentional misrepresentation,
Stern "is entitled to money damages representing the monies due
from Seykota pursuant to the agreement").   Seykota's alleged
duties to share profits with Stern, and manage investment are
identical to his duties under the contract.  *Cf.* Stern Dep., Aug.
27, 2002, at 60 (describing the alleged contract).

Civil Nos. 2002-63 & 2002-134
Memorandum Opinion
Page 11

Stern has failed to allege independent tortious conduct.
Accordingly, Seykota is entitled to judgment as a matter of law.
His motion for summary judgment on Count III of Stern's
Counterclaim will be granted.

### iv. Detrimental Reliance

In Count IV of Stern's Counterclaim, Stern alleges that she
is entitled to damages because she detrimentally relied on
Seykota's promise to give her fifty percent of the performance
profits.  By itself, detrimental reliance is not a cognizable
legal claim.  Rather, detrimental reliance is an element of
intentional misrepresentation.  *See* Restatement (Second) of
Torts, at § 525 (1965) (providing the elements for intentional
misrepresentation).  At best, Count IV supplements Stern's
earlier intentional misrepresentation claim.  Significantly, it
fails to state a claim.  Accordingly, Seykota's motion for
summary judgment on Count IV of Stern's Counterclaim will be
granted.

### v. Equitable Ownership/ Equitable Lien

In Count V of Stern's Counterclaim and Count I of Stern's
Complaint, she alleges that Seykota's promise to give her the
condominiums prompted her to invest money and labor in
renovations.  As a result, Stern claims she is entitled to an
equitable lien on the property.

Civil Nos. 2002-63 & 2002-134
Memorandum Opinion
Page 12

"An equitable lien, is, as the name implies, a creature of
equity; it is the right, not recognized by law, to have a fund or
specific property applied to the payment of a particular debt and
is based upon the older equitable doctrine of unjust enrichment."
*Am. Fidelity Fire Ins. Co. v. Construcciones Werl, Inc.*, 407 F.
Supp. 164, 182 (D.V.I. 1972); *see also United States v. Francis*,
623 F. Supp. 535, 538 (D.V.I. 1985) ("The purpose in granting an
equitable lien is not to give [the plaintiff] a profit, but
rather to return... the value of the benefit conferred.").  To
establish an equitable lien case, the plaintiff must show that
the parties agreed that the property at issue would be used to
satisfy a specific debt.  *See Am. Fidelity Fire Ins. Co.*, 407 F.
Supp. at 183.

In his deposition, Seykota states that he never intended to
use the property as a means of compensating Stern for her work on
the renovations.

To counter Seykota, Stern offers her affidavit, which
states:

> In May 2001, Seykota informed me that the Secret Harbor
> condominiums would be my home after the completion of
> renovations.
> 
>                     ...
> 
> I began to renovate the condominium units in or about
> June of 2001. In reliance on Seykota's promise, I paid
> in excess of $52,000 in renovation costs.  All
> renovations were paid for by me directly, or by me
> through the distribution of my profits from the
> partnership.

Civil Nos. 2002-63 & 2002-134
Memorandum Opinion
Page 13

*See* Stern Aff., January 25, 2005; Opp. to Summ. J., Ex 2 at ¶¶

35, 36.   It is undisputed that Stern renovated the condominiums

under the impression that her labor and investments would

directly benefit her.   Significantly, however, it is also

undisputed that Seykota did not ask Stern to invest her own money

to renovate the property; and that Seykota did not agree to

convey the condominiums to Stern as payment for the renovations.

As a result, Seykota's motion for summary judgment will be

granted on Count V of Stern's Counterclaim, and Count I of

Stern's Complaint.

**vi.   Unjust Enrichment**

In Count VI of Stern's Counterclaim and Count II of Stern's

Complaint, she alleges that Seykota was unjustly enriched by her

work renovating the condominiums.

There are genuine issues of material fact surrounding Count

VI of Stern's Counterclaim, and Count II of Stern's Complaint.

Accordingly, Seykota's motion for summary judgment will be denied

as to these claims.

**vii. Breach of Contract**

Stern alleges that Seykota breached a contract to give her

the condominiums in exchange for her work within one year from

their relocation in St. Thomas.

Civil Nos. 2002-63 & 2002-134
Memorandum Opinion
Page 14

Seykota argues that he is entitled to summary judgment, because, as stated in his deposition, there was never a contract to give Stern ownership of the property in exchange for her work.

Stern responds by presenting her own affidavit, stating that Seykota did, in fact promise to transfer ownership.   However, Stern never provides any evidence of consideration.   At best, Stern has shown that Seykota promised to give her the condominiums as a gift.   Stern conveyed nothing in return.[3]

It is well-established that "the formation of a contract requires a bargain in which there is a manifestation of mutual assent to the exchange and a consideration." Restatement (Second) of Contracts, § 17 (1981).[4]   Accordingly, "[m]ere expression of an intention to make a gift of land is not sufficient to entitle a person to specific performance of a contract to convey...." *Stein v. Green*, 128 N.E.2d 734 (Ill. 1995).

Stern has failed to provide any evidence to place in dispute Seykota's statement that there was no contract.   Accordingly,

---

[3] For example, according to Stern's deposition, Stern states that in 1999, Seykota told her:

He would provide for me.  I didn't have to worry.  He was managing our money.  He was going to give me a house.  I would be well.

*See* Stern Dep., Aug. 27, 2002, at 146.

[4] The Restatement outlines limited exceptions to this general rule, such as payment for pervious benefits and promises to perform voidable duties. *See* Restatement (Second) of Contracts, §§ 82-94.  However, none of these exceptions apply to Stern's allegations.

Civil Nos. 2002-63 & 2002-134
Memorandum Opinion
Page 15

Seykota is entitled to judgment as a matter of law.   Seykota's
motion for summary judgment will be granted on Count VII of
Stern's Counterclaim.

**viii. Negligent Infliction of Emotional Distress**

In Count VIII of Stern's Counterclaim, she alleges that
various acts by Seykota, including threatening to turn off the
condominiums' utilities and degrading verbal and physical
conduct, amount to negligent infliction of emotional distress.

To prevail on a claim of the negligent infliction of
emotional distress, the plaintiff must show not merely emotional
disturbance, but also bodily harm or other compensable damages.
*See* Restatement (Second) of Torts, § 436A (1965); *accord Lempert
v. Singer*, 776 F. Supp. 1356 (D.V.I. 1995) (holding that, absent
physical harm, a plaintiff cannot prevail on negligent infliction
of emotional distress).

Seykota argues that he is entitled to summary judgment,
because Stern has failed to show any physical injury in relation
to his conduct.

The record contains no evidence that Stern suffered a
physical injury.   Indeed, Stern does not even allege that such an
injury occurred.

Accordingly, Seykota will be granted summary judgment on
Count VIII of Stern's Counterclaim.

Civil Nos. 2002-63 & 2002-134
Memorandum Opinion
Page 16

## ix. Intentional Infliction of Emotional Distress

In Count IX of Stern's Counterclaim and Count IV of Stern's Complaint,[5] she alleges that Seykota's conduct amounts to the intentional infliction of emotional distress.

The tort of intentional infliction of emotional distress requires "extreme and outrageous conduct [that] intentionally or recklessly causes severe emotional distress to another...." Restatement (Second) of Torts, § 46 (1966). Courts have divided this requirement into four separate inquiries: "(a) deliberate or reckless infliction of mental suffering, (b) outrageous conduct, (c) the conduct must have caused the emotional distress; and (d) the distress must be severe." *See, e.g., Watson v. Bally Mfg. Corp*, 844 F. Supp 1533, 1536 (S.D. Fla. 1993)(following the Restatement in accordance with Florida law).

Seykota admits that he and Stern had a strained relationship after he left St. Thomas, but he denies that any of his conduct was so outrageous that it would cause the intentional infliction of emotional distress.

The Restatement defines outrageous conduct as "so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Restatement (Second) of Torts, § 46 cmt. d (1965);

---

[5] Count IV of Stern's Complaint is mislabeled as "Negligent Infliction of Emotional Distress."

Civil Nos. 2002-63 & 2002-134
Memorandum Opinion
Page 17

*see also Heywood v. Cruzan Motors, Inc.*, 762 F.2d 367, 372 (3d
Cir. 1986) (When there is no physical injury, "the conduct is
expected to be sufficiently extreme... to guarantee a claim is
genuine")(internal quotations omitted).

Stern alleges that several of Seykota's actions amounted to
outrageous conduct, including repeated insults about her
appearance and references to her as "a grotesque piece of
property," as well as a two-to-three hour tirade, in which
Seykota yelled that she was "crapping on him" and that he would
"break" her.  *See* Stern Aff., January 25, 2005; Opp. to Summ. J.,
Ex 2 at ¶ 40.

According to Stern's affidavit, Seykota's abuse was both
severe and persistent.  Several factors from Stern's evidence
satisfy the legal requirements for intentional infliction
emotional distress.

First, by controlling Stern's living situation and finances,
Seykota held a position of power over Stern.[6]  A reasonable jury
could find that he abused that power by verbally assaulting her.
As a matter of law, "[t]he extreme and outrageous nature of the
conduct may arise not so much from what is done as from abuse by

---

[6] It is undisputed that Seykota controlled Stern's living arrangements
and finances.  Indeed, Stern alleges that Seykota used this position to gain
leverage over her.  *See, e.g.*, Stern Aff., January 25, 2005; Opp. to Summ. J.,
Ex 2 at ¶ 40 ("When I hesitated to return [to living with Seykota], he... told
me that I would never receive my share of the partnership profits if I did not
come back to him.")

Civil Nos. 2002-63 & 2002-134
Memorandum Opinion
Page 18

the defendant or some relation or position which gives him actual or apparent power to damage the plaintiff's interests." *Milton v. Ill. Bell Tel. Co.*, 427 N.E.2d 829, 832 (Ill. App. 1981)(quoting PROSSER ON TORTS, 4th Ed., p. 56); *accord* Restatement (Second) of Torts, § 46 cmt. e (1965).

Additionally, the evidence suggests that Seykota knew Stern was particularly sensitive to comments about her appearance, and that he intentionally berated her physical faults to belittle her.[7]  When a defendant knows that the plaintiff is peculiarly susceptible to emotional distress, conduct that exploits the plaintiff's sensitivity can give rise to a claim for intentional infliction of emotional distress.  *See* Restatement (Second) of Torts, § 46 cmt. f (1965); *see also Anderson v. Prease,* 445 A.2d 612, 613 (D.C. App. 1982)(applying this principle when a doctor knew his patient's unique susceptibility to anxiety).

---

[7] Stern's affidavit contains a detailed account of this abuse:

[After an argument], Seykota developed new tactics to humiliate and hurt me.  During 1992...I was involved in a severe automobile accident... I...remain horribly scarred to this day.  After the accident I had very little scalp hair, and cosmetically required a wig.  Seykota regularly engaged in 'philosophical' discussions with me and the children about my unfavorable physical differences, scars, weight gain, skin and hair.  He nearly nightly opined that I could not 'compete against a more perfect woman.'  As a punishment 'exercise' he 'philosophized' about a woman less damaged, with thicker hair, nicer and tighter skin and no scars.  He catalogued each of my deformities and discussed them one by one....

*See* Stern Aff., January 25, 2005; Opp. to Summ. J., Ex 2 at ¶ 40.

Civil Nos. 2002-63 & 2002-134
Memorandum Opinion
Page 19

Finally, in Stern's affidavit, she states that Seykota repeated the offensive conduct regularly over the several months that they resided in St. Thomas.  Other courts have noted that "[a]lthough insulting language intended to denigrate a person may not, in and of itself, rise to the required level of extreme and outrageous conduct, liability may be premised on such expressions where... defendants' campaign of harassment and intimidation is constant."  *See, e.g., Mitchell v. Giambruno*, 35 A.D.3d 1040, 1040 (N. Y. App. Div. 2006) (holding that neighbors repeated harassment of a same sex couple rose to the level of intentional infliction of emotional distress); *accord Ford v Hutson*, 276 S.E.2d 776, 781 (S.C. 1981)(holding that the defendant's two-year campaign of assailing plaintiff with profane remarks could amount to intentional infliction of emotional distress).

Given this evidence, a reasonable jury could find that Seykota's treatment of Stern was atrocious.  Accordingly, Seykota's motion for summary judgment on Count IX of Stern's Counterclaim, and Count IV of Stern's Complaint will be denied.

**x. Slander**

In Count X of Stern's Counterclaim, she alleges that Seykota slandered her by falsely telling her sister, Tizes and unnamed third parties that Stern had stolen money from Seykota.

Civil Nos. 2002-63 & 2002-134
Memorandum Opinion
Page 20

A successful defamation claim has four elements: (1) a false
and defamatory statement concerning the plaintiff; (2) an
unprivileged publication to a third party; (3) fault amounting at
least to negligence on the part of the publisher; and (4) special
harm.[8]  *See* Restatement (Second) of Torts, § 558 (1965).  Special
harm is defined by the Restatement as "the loss of something
having economic or pecuniary value." *Id.* at § 575 cmt. b.

Seykota argues that Stern has not presented any evidence
that Seykota made the alleged false statement.  He also argues
that there is no evidence Stern suffered any special harm.  Stern
has done nothing to refute Seykota on this point.

Because there is no genuine issue of material fact and
because Seykota is entitled to judgment as a matter of law on
this count, summary judgment will be granted on Count X of
Stern's Counterclaim.

## xi. Intentional Misrepresentation

In Count III of Stern's Complaint, she alleges that Seykota
intentionally misrepresented his plan to keep the condominiums
for himself.  As a result, Stern claims she invested money and
labor into the property to her detriment.

---

[8] Certain types of defamation do not require this fourth element, but
none are applicable to Stern's claim.  *See generally*, Restatement (Second) of
Torts §§ 569-574 (1965) (defining libel and slander pre se, types of
defamation for which no special harm is required.)

Civil Nos. 2002-63 & 2002-134
Memorandum Opinion
Page 21

A successful intentional misrepresentation claims contains four elements: (1) a knowing misrepresentation of a material fact, (2) intent by the defendant that the plaintiff would rely on the false statement, (3) actual reliance, and (4) detriment as a result of that reliance.  *See In re Tutu Wells Contamination Litig.*, 32 F. Supp. 2d 800, 802 (D.V.I. 1998).

Seykota uses his deposition to argue that Stern does not meet any of these elements.  However, Stern's deposition and affidavit contradict Seykota on every relevant point.  Indeed, there are numerous material facts in dispute.  Seykota's motion for summary judgment on Count III of Stern's complaint will be denied.

## IV. CONCLUSION

For the reasons discussed above, the Court will grant Seykota's motion for summary judgment on Counts III, IV, V, VII, VIII and X of Stern's Counterclaim, and Count I of Stern's Complaint.  The Court will deny summary judgment as to all other counts.

An appropriate order follows.


July 18, 2007                         s/_____
                                        Curtis V. Gómez
                                        Chief Judge